At a Court of Oyer and Terminer held at this term, Lewis List was indicted and tried for the murder of John R. Baylis, a constable and police officer of the City of Wilmington, in that city on the 9th day of September preceding: and as usual the indictment was for murder of the first degree.
The prisoner had been drinking to excess for a day or two before that, and had been to some extent noisy and troublesome on the street in that condition, and had been *Page 134 
roughly rebuked and handled for it the night before by the deceased in his capacity as a peace officer and a member of the city police, and early the next morning complaining of this treatment to a neighbor on his casually stepping into his house for a few moments, the prisoner borrowed a loaded six-barrel pistol from him, and stepping out with it in his hand on the street proceeded up it towards the next corner above, where Baylis was then standing leaning against a lamp post with a drawn pistol of a similar description also in his hand. The prisoner was brandishing his in his hand in a violent and excited manner, and threatening to kill any one who attempted to interfere with him as he thus proceeded up the street. They had each in the mean while cocked their pistols, and on the prisoner's reaching the distance of half the square from the corner where Baylis was still standing leaning against the lamp post, the latter called out to him in a defiant tone to "fire away!" when the prisoner instantly fired one shot from his pistol at him, but without any effect, and which the deceased immediately returned with one discharge from his at him, but likewise without any effect. The prisoner then fired a second time at the deceased, and the deceased immediately afterwards a second time at him, and with the like results in both instances. The prisoner then turned about and ran down the street past the front of his dwelling-house and up an alley into the kitchen of it, rapidly pursued by the deceased in a very angry and excited mood, swearing he would kill him, up to the door of it which the prisoner had endeavored to close against him immediately on entering it, but without being able to get it quite closed and fastened before the deceased had reached it, when a brief struggle immediately ensued between them, the one by main strength on the inside to hold it as nearly closed as then could be, and the other on the outside to force it open and effect an entrance into the kitchen. No demand however was made of the prisoner by the deceased for his surrender, or for his admission as an officer for the *Page 135 
purpose of arresting him for the offense which he had just committed, on the contrary, he was excited, angry and violent, and with his pistol in his hand soon forced his way by superior strength into the kitchen, hurling the prisoner back from the door half across the room as it was then irresistiably forced open by him. Several pistol shots then immediately followed in the kitchen when Baylis fell to the floor and soon expired. One of them afterwards extracted from the wood-work of it was too large for the calibre of the prisoner's pistol, but was of the proper size for that of the deceased. The testimony showed that his death was caused by three small bullet wounds, one in the neck and two in the head, and that both of the last were mortal.
The fact of the killing of John R. Baylis by the prisoner, Lewis List, in the City of Wilmington on the ninth day of September last, and that Baylis was at the time a constable and police officer of the city are proved and not denied. At common law the crime of murder consists of the killing of any person under the peace of the State, with malice prepense or aforethought, either express or implied by law; and in either case it consists at common law of but one degree. By a comparatively recent statute of our State, however, the crime has been divided into two degrees, as they are termed, that is to say, into the crime of murder of the first degree, and the crime of murder of the second degree; and in describing and defining them it provides that every person who shall commit the crime of murder with express malice aforethought, or in perpetrating, or attempting to perpetrate any crime punishable with death, shall be deemed guilty of murder of the first degree and of felony, and shall suffer death; and every person who shall commit the crime of murder otherwise than is set forth in the preceding provision, shall be deemed guilty of murder of the second degree and of felony, and shall be fined at the discretion of the Court, shall stand one hour in the pillory, shall be whipped with sixty lashes, and shall be imprisoned for life, if a white person, but if a negro or mulatto, shall be sold a servant to the highest bidder, for life. Express malice aforethought is therefore the general characteristic of the crime of murder of the first degree under the statute, and except where murder is committed in perpetrating or attempting to perpetrate, any crime punishable with death, it is the essential and indispensible ingredient of it. For a definition of the crime of murder with express malice aforethought the statute silently remits us to the common law where it has been long ruled and recognized to be when one person kills another with a sedate deliberate mind and formed design, such formed design being evidenced by external circumstances showing the inward *Page 138 
intention, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. And where this sedate deliberate mind and formed design to do the bodily harm is wanting, or the external evidences in the case fail to show such a sedate deliberate mind and formed design to the satisfaction of the jury, the killing cannot be deemed to have been committed with express malice aforethought, or to constitute the crime of murder of the first degree under the statute.
And the language of the statute which provides that every person who shall commit the crime of murder otherwise than with express malice aforethought, or as is set forth in the first provision of it, also remits us to the common law for the meaning and intention of it, and the import of which is that every person who shall commit the crime of murder otherwise, that is to say, not with express malice aforethought, but with malice aforethought implied by law, shall be deemed guilty of murder of the second degree under it, and shall be punished accordingly. But notwithstanding this kind or degree of malice aforethought under the statute is not express, but implied by law, it is susceptible of direct and positive and circumstantial proof as well as express malice, for the law never implies it without sufficient evidence apparent to the satisfaction of the jury in the case to warrant the inference of it. Malice aforethought is implied by law from any deliberate, cruel act committed by one person against another, however sudden, as if one person kills another suddenly without any, or without an adequate provocation in contemplation of law to reduce the killing to the crime of manslaughter, the law will imply that it was committed with malice aforethought; and wherever the act without such provocation is committed with deliberation, cruelty, or indifference to its consequences, but not with express malice, or in a way, or with means likely to produce death, the law will imply malice aforethought from the act itself, notwithstanding no particular enmity, *Page 139 
resentment, or hatred against the person killed can be shown on the part of the person killing; and in all such cases the killing will constitute the crime of murder of the second degree under our statute.
Manslaughter may be defined to be the offense of killing a human being without malice, either express or implied, but under such circumstances as cannot render it wholly innocent, or excusable or justifiable in law. When the killing is done in a sudden transport of passion and heat of blood on a sufficient provocation in contemplation of law, it is imputed by the benignity of it to the weakness and infirmity incident to our nature, which negatives, even the implication of malice, and which is essential, at least, to constitute murder of the second degree under the statute, but which is nevertheless criminal and felonious, for it also constitutes a high crime under our laws, and is punishable with fine and imprisonment and the infamy which follows as a legal consequence in all cases of felony. And of this crime there are two classes, voluntary and involuntary manslaughter. The first is where the killing is intentional, but is done in a sudden heat of blood under such a provocation as the law considers sufficient to repel the presumption or implication of malice aforethought, and to negative the existence of that calmness and deliberation which is essential to constitute it, as in cases of mutual combat where the parties have become involved in the fight without any preconcert between them for the purpose, or any premeditation and preparation for it on the part of the slayer, and it was done in the heat of passion produced by it, suddenly, without previous premeditation or preparation, and before there is time for the blood to cool, or that sudden transport of passion to subside; and the more dangerous and deadly the instrument or weapon used and with which the killing is intentionally done in such cases, the more rigid and exacting is the rule of law on this subject, in order to reduce it from the crime of murder of the first or second degree *Page 140 
under our statute, to that of voluntary manslaughter, as it is known and defined in the law. It is not necessary however on this occasion to advert to the other well-known, but comparatively limited classes of cases in which it has been held, and is now well settled, that the provocation may be sufficient to mitigate and reduce a voluntary act of homicide from the crime of murder to that of manslaughter at common law; nor is it necessary now to say more in regard to the other class of cases referred to, and denominated cases of involuntary manslaughter, than to remark generally that the prominent cases of this kind occur where the killing is not done intentionally, but is the result merely of gross and culpable negligence on the part of the accused in the relation held by him at the time to the deceased.
But it has been contended in this case on behalf of the prisoner that he is entitled to an entire and absolute acquittal on the evidence before you, because he shot and killed the deceased in self-defense in an unlawful and violent assault made upon him with a loaded pistol in his own house, after he had abandoned and retreated from the preceding contest between them on the street, and had taken refuge from him in it; and the counsel for the prisoner has asked the Court to so instruct you. The evidence is before the jury, and there is no occasion for our repeating it. We will say, however, with reference to this defense that excusable homicide se defendendo, or in self-defense occurs in law when a person is assaulted upon a sudden affray, and in defense of his person where certain and immediate suffering of some serious and dangerous injury in his person would be the consequence of waiting for the assistance or protection of the law, and there was no other probable means of escape from it he kills the assailant. And in such case it is excusable or justifiable homicide. But to reduce homicide even in self-defense to this character and innocent complexion, it must be shown that the party killing was closely pressed by the party killed and had retreated as far as he conveniently *Page 141 
or safely could in good faith with the honest intent to avoid the violence of the assault; and the jury in such case must be satisfied that unless he had killed the assailant, he was in imminent danger of losing his own life, or of suffering some great bodily harm. It closely borders on the crime of voluntary manslaughter as before defined, for in each it is alike presupposed that violent anger and passion has been excited on both sides, and that blows, or what is equivalent to them, have passed between the parties, but with this distinguishing difference between them, that in manslaughter it must appear, either that the parties were actually engaged in mutual combat when the mortal stroke or wound was given, or that there was not time for the passion afterwards to subside before giving it, or that the slayer was not in imminent danger of being killed by his assailant, or of otherwise being grievously injured by him in his person; while in homicide, excusable or justifiable on the ground of self-defense, it must appear either that the slayer did not begin the fight, or that having begun it, he endeavored to decline and avoid any further conflict, and being afterwards closely pressed by his antagonist, he killed him in defense of his own life. It is also a well settled principle of criminal law on this subject that if a person engaged in a sudden affray quit the combat before he has inflicted a mortal wound on his antagonist, and retreat and fly as far as he can with safety, and then impelled by sheer necessity kills his adversary in defense of his own life, it is excusable homicide. It differs from manslaughter in the particular before adverted to, that in manslaughter the mutual combat is assumed to continue until the mortal stroke or wound is given, or that the heat and passion engendered by it so continues on the part of the person giving it; but in excusable homicide of this character the slayer must have declined the combat and retreated as far as he safely could before the mortal stroke was given and then only in defense of his own life, or to save himself from some great bodily injury. And just here we *Page 142 
would say that on this point it is also a well settled principle of law that every man's house is his castle, and is considered his best and safest place of refuge in such case, and that no one is required to retreat or flee from personal danger further than the security of his own dwelling in such cases. And in such a case of excusable homicide in self-defense, it is not material which of the parties began the sudden affray, or gave the first blow, or fired the first shot, or whether the slayer had inflicted wounds not mortal before he declined the combat and retreated or fled from it, and from his adversary, because if he declines the combat before a mortal wound is given by him, and retreats as far as he can with safety, or the law requires of him in such a case, he will be justified in giving a mortal wound afterwards in defense of his own life. But at the same time we must further observe to you in regard to the law on this subject, that when in such a case the sudden affray is begun by the slayer, and was prompted by antecedent malice and animosity on his part against the other party which may be inferred from facts and circumstances, and the retreat from the affray is but specious and colorable, and he then turns on his pursuing adversary and kills him, it will be murder, at least, of the second degree under the statute.
But these general principles of the law which we have just stated are subject to certain well-known qualifications in the case of a public officer when he is acting in the due execution of his office and is clothed with the sanction and the powers of it, and his death is the result of unlawful resistance to his authority in his efforts to arrest the slayer. All ministers and officers of justice, such as sheriffs, constables, bailiffs, watchmen and policemen while in the execution of their office are under the peculiar protection of the law, for without it the public peace and tranquility could not be maintained, nor would either life or property be secure against the lawless; and for these reasons the killing of public officers in the performance of the duties of their office, has been deemed *Page 143 
murder with malice aforethought, as being an outrage willfully committed in defiance of the justice and authority of the State. But this protection of the law extends only to public officers, who have authority to arrest and imprison, (and their assistants,) and who use that authority in a proper and lawful manner, for it is well settled that any material or substantial defect in the authority of the officer, or in the legality of the process with which he is armed, or in the regularity of the proceeding on his part, will, in general, have the effect to extenuate the crime of killing him and reduce it from the grade of murder to that of manslaughter in such a case. The authorities and decisions on this point warrant us in stating generally that when such an officer in executing his office, as in making an arrest, or attempting to make an arrest on the commission of a felony, or a breach of the peace, proceeds irregularly and transcends his authority, and becomes a wrong doer and a trespasser himself in the eye of the law, it affords him no protection or impunity in such excess; and if in so doing he be killed, the offense will amount to no more than manslaughter in the person whose rights and liberties have been so violated and invaded by him. If such an officer, however, proceeds irregularly or illegally and exceeds his official authority in his efforts to apprehend a person at the time legally liable to arrest, and is opposed and resisted with force and violence and killed by him, that fact cannot of itself constitute a case of excusable homicide in self-defense, or reduce it below the crime of manslaughter at least.
As to the manner in which such an officer should proceed to make an arrest, it is not easy to prescribe any precise and definite rule under the varying circumstances and degrees of force and resistance which he may be destined to encounter in the legitimate discharge of his hazardous and responsible duty. But there is one rule well settled on the subject, and it is this, when a criminal offense of the grade of felony has been committed in the view of the officer, he may at once proceed at his own instance and by virtue of his official authority without any process or warrant, to arrest the offender, and if resisted in the effort to apprehend him, he may use and employ whatever force and means that may be necessary under the circumstances to overcome, that resistance and to effect his arrest. But even when the criminal offense committed in the *Page 144 
view of the officer is of the grade of felony, and the offender does not resist the officer, but merely flies or runs away from him to avoid arrest, the conduct of the officer should be cautiously regulated by the nature of the proceeding. For in civil cases, and also in the case of a breach of the peace, or any other misdemeanor or criminal offense less than felony, if the officer should pursue the offender in his flight to escape from arrest, and kill him in the pursuit, it will at least be manslaughter in contemplation of law under any circumstances, and may amount to murder when they arc of a wanton, cruel and aggravated character. But if a felony be committed, and the felon fly from justice, the law holds it to be the duty of every man, and still more so, of every police officer, to use his best endeavors to prevent his escape, and to secure his arrest; and if in the pursuit the party flying be killed, where he cannot be otherwise overtaken, it will be deemed in law justifiable homicide. And the importance of this distinction which we have just noticed, and the application of it to this case, will be seen when the jury comes to consider the evidence before them in relation to the beginning of the difficulty between the prisoner and the deceased on the morning of the 9th of September last, and which resulted in the death of the latter in a short time afterwards. For if the jury believe from the evidence that the prisoner began the affray between them by firing a pistol at Baylis with intent to kill him, and that he was at the time near enough to him to have killed him, had he hit him, it constituted an assault and battery with intent to murder him, which is made a felony by express provision of our statute; but should the jury not be satisfied from the evidence that he fired a *Page 145 
pistol at him with the intent to kill him, it would not have been a felony, but a misdemeanor merely, the intent to kill, as well as the firing of the pistol at him, being indispensably necessary to constitute the act of felony.
But without commenting on what immediately preceded or immediately followed the firing of the first pistol-shot by the prisoner, on the part of either of them according to the evidence, we must say to you that if the prisoner afterward turned and fled from the street to his house pursued by the deceased, and shut the outer door against him, and endeavored to hold it closed against him to prevent his entering it, and the latter proceeded at once with force and violence and in an angry and threatening manner with a pistol in his hand and with threats on his lips to kill the prisoner, to force the door open, and so effected his entrance into the house, the proceeding, to say the least, was grossly irregular on his part as a public officer, and exceeded the proper limits of his official authority in making an arrest, even under such circumstances; and if in the violent rencontre which immediately ensued between them with pistols in the hands of each of them in the house, the prisoner shot and killed Baylis, the killing would amount to the offense of manslaughter only. For if the jury should be satisfied from the evidence that the assault and battery committed by the prisoner on the deceased before he fled from the street to his house by shooting at him with his pistol, and that it was done with the intent to kill him, and that it therefore amounted to a felony, the deceased as a constable or a police officer, would not have had authority in law to proceed with force or violence to break open the door for the purpose even of making a peaceable arrest simply, without previously and formally notifying the prisoner of his business and purpose to arrest him peaceably, and a demand to enter for that purpose, and the refusal of that demand by the prisoner; and, of course, equally irregular and unwarrantable, if not more so, would such a proceeding have been on the part of the deceased, if the offense for which the *Page 146 
prisoner was to be arrested in such a manner, had been but a misdemeanor instead of a felony.
If such then were the facts of the case according to the evidence before the jury, the Court were bound to say to them, that the prisoner having fled to the sanctuary of his own dwelling, and shut himself up in it, as best he could, Baylis, the deceased, had transcended his authority as a public officer in his violent attempt at once to force his way into it, even if his purpose was merely to arrest him. Had ho gone to List's door, notified him of his business and purpose, and demanded his surrender, and he had refused to give himself up to him as his prisoner, he would then have been warranted and justified in forcing an entrance into it through the door by breaking it open, if necessary, and yet even in that case he should have proceeded to make the arrest as peaceably and gravely as possible, and without angry menaces or threats of vengeance or violence. It could not, however, justify or wholly excuse the killing of him by the prisoner under the circumstances, or mitigate of reduce the offense in law below the crime of manslaughter.
 Verdict — Not guilty.